Please be seated. And we'll call the next case, please. 3-13-0353, Villanova Development Company, accounted by Philip Corey, v. Illinois Central College, FDU by James Tasker. Mr. Corey. Court, please. As I was getting prepared for this day, I was thinking of, well, it's not Groundhog, but it's similar because we're back here again only a couple years after we were here the first time. And I'd like to start spending a moment on some background leading up to the contracts which give rise to these proceedings. Back in the 1950s, the Cohn family owned approximately 400 acres of prime farmland in East Peoria, abutting 116. IDOT decided to dissect that with a road, which is now known as Route 24. And they could not come to an agreement with regard to the condemnation price, so they went to the court. The Supreme Court decided the price and it did one other thing. It determined that there would only be one access route from the land on both sides of the road at 315, which is the section of the road that was given to them. And all other access routes onto the Cohn property were eliminated by the Supreme Court. Fast forward to 1966. At the top of the hill, which was the beginning of the Cohn property on the west side, the state college was there. They needed more land. In November, they entered into an option contract which said that we want 25 acres of land and we'll pay you $50,000. The 25 acres of land took into account the one access route that the Cohn property had on the west side of the property, which covered the 115 acres or so that they had there. Assuming Route 24 runs east and west, you're talking about the south side of 24. I always think of it as running north and south. I'm a native of Peoria, too, so what do I know? Anyhow, it's on that south side. So Cohn, who was an architect by trade, said, okay, you can have this, but I need access to my land. Otherwise, it'd be landlocked. He did two things in the option agreement. He said, first of all, I want an easement right from your land to the land that you're not buying. I'll point out where I want it, and I want you to dedicate and construct a road for that easement right. Is this directly off State Route 24? Yes. It was 174 at the time. Yes, that is correct. That option agreement is the focal point of everything that follows. Everything that follows was an implementation of the option agreement. The option agreement stated that it was binding on the successors and the signs. Not only in the preamble portion, but in the bottom portion of the last paragraph. This agreement is binding on. What happened next was three or four months later, March, I think, of 1977, the school exercised their option. They prepared a deed, and the option contract said you have to dedicate and construct this road one year after you dedicate the deed. They prepared the deed, and the deed mirrored the option agreement. It said two things, three things. It said, first of all, we're going to have an easement. Secondly, that easement is going to last until you, the school, dedicate and construct a public road in accordance with the requirements of IDOT and the city of East Peoria. And it said one other thing. This deed is given in fulfillment of the option contract. The deed was May 12, 1967. It was not recorded until May 17. No, April. It was April 12, 1967. It was not recorded until May 17. It was not recorded until after the third agreement, the performance agreement, was entered into on May 12, 1967. The performance agreement states, right at the beginning, that this agreement is made to implement and put into effect all of the terms of the option agreement. Not some of them. All of them. The performance agreement had the same two requirements. There'd be an easement. There'd be a dedication and construction of a road by the school in accordance with the IDOT and city of East Peoria requirements. It had one other thing in there. And that was the time frame by which Mr. Cone had to designate the area he wanted the easement to flow. That was three months. And that's important for purposes of this case before the court because the trial court took that, perched on that three month period and said, and forgive me for reading, but I don't want to miss a quote. First of all, it said this is paragraph D of the findings. And it's the only paragraph that indicates a rationale for the decision. The separate agreement was entered into on May 12, 1967 and contemplated that Cone would within three months thereafter designate the route of the easement reserved by sellers in the deed. And then he has emphasis at it and highlights the word sellers. Then ICC was to dedicate such route and build a road. The next sentence. Given the short time duration, it is logical to conclude the parties intended to bind and benefit only themselves by such as opposed to such obligation and benefits extending to Cone's successors. I said in my brief and I say it out loud, I'm hard pressed to understand how that is logical from a standpoint of intention of the parties. The three requirements for a covenant running with the land, the court knows and I apologize for repeating them, is privity of contract, the obligation touches or concerns the land and the intention of the parties. The trial court in this last trial we had acknowledged that it would be hard pressed to understand how you could argue against the concept that he was required to dedicate and construct the road was not something that touched or concerned the land. That's on report of proceedings page 9 of the trial proceedings. So the issue here is how does three months constitute a rationale that says it's only between two people and not the successors of the signs when not only the option agreement, the warranty deed which was the only recorded instrument here and the performance agreement all state that it's for the benefit of everybody, all the terms of the contract for the successors and the signs. I may be missing the point here, but what you're saying is why are you throwing in successors and the signs in between the sellers? Who bought it? ICC bought it, right? Correct. Who was the seller? Cone, right? Correct. So what's the successors and the signs? Because the language in the option agreement and the deed says that it's for the benefit of the successors and the signs. Yeah, it's for the benefit but is the trial court saying if one is created it would be for the benefit? Is it not a question here that Cone had three months to designate where this was to be? That's what the performance agreement stated. Okay. And so is the trial court trying to say it was abandoned because it didn't happen within three months? Am I trying to say that? Well, the trial court. Is that what the trial court is saying? No, the trial court is saying because he had a designation of three months, that proves that it was only between he and ICC. That's what it's saying. The intention was personal in nature as opposed to a covenant running with the land. Okay. The requirement to dedicate and to construct. Now this court the last time we were before in its opinion stated that the conjunctive and tied to dedication and construction was a mandatory obligation on the grantee. That's in your prior opinion. And if that's in fact, and you cited cases to do it. Was that a published opinion? It was a published opinion, Your Honor. It was the first opinion that came out. I referred to it in my brief and I cited the same cases in my brief as the appellate court did in supporting their argument. So what we have here is a given fact that dedication and construction are mandatory obligations on the grantee. The only issue, as I see it, is is a three month dedication requirement important? What happens, and the court doesn't address this, but what happens if between the time they signed the contract and closed on it in 1978 March and in May Combe entered into a contract to sell his property. Does that mean that the buyer would not have the same rights as Combe does? What happens if Combe assigned the contract to him? Does that mean he would not have the same rights? I suggest to the court there is no law to raise that conclusion and even remotely can be a part of any logical law in this jurisdiction. What in fact happened is almost about the same thing that I just suggested. Before Combe dedicated his easement rights, he entered into an option contract with Joe Rafel, who was the assignee of the plaintiff in this case. Ten years later, ten years, the letter exhibit five of the joint exhibits that we have indicates that in 1977 October, Mr. Combe wrote to Mr. Rafel suggesting to him that based upon their option agreement, the option and Combe that he talked to the ICC and ICC agreed to dedicate the ground. Thank you. A year later, 11 years later, after the statute had run on any personal obligations under a written contract, ICC dedicates the ground and doesn't do anything else and it sits. If it was a personal undertaking and exhibit seven indicates it's a letter from ICC's lawyer to Combe's lawyer indicating that we're going to waive the statute of limitation period here as a possible defense to avoid a dispute and we will dedicate the ground. Well, would he have been landlocked without it? He wouldn't. There's no question about that. However, Judge, if in fact it was a personal undertaking they didn't have to dedicate the land, by law he would have gotten something but they didn't have to issue a release and pay $12,000 why did they do that? I know ICC did not have enough money because you're going to hear that argument in a moment. Why would they voluntarily pay $12,000 if there was no statute that they could enforce the permit? The actions of two people going out there working into some kind of settlement doesn't determine what the law is. True, true. I submit that they tried to enter into that release agreement even though they didn't have privilege of contract to do so because they felt it was incumbent. And I'd like to just close by calling your attention to a case that I cited in my brief. Did you cite the prior case you say in your brief? I did. It's people versus something. It's not the same parties? Pardon me? The same parties were up here before, right? Right. I cited it in the brief that you have before you. You're talking about the mandatory obligation? No, I'm talking about the prior case. Our case, our decision. I did not cite the entire decision. I just cited I just quoted from the decision and cited the cases that this court cited. Oh, so this case entered in Rule 23 order? No. Yes. The previous decision on this matter was not published. Okay. And the reason I bring this up, counsel, is an appendix ought to have that. It would be helpful to the court because it's an unpublished order. To see what, not all of us were on that prior decision. I'm sorry. For some reason I thought the opinion was unpublished. I apologize. I'd like to close by just calling your attention to the LaSalle-Westmont case that I put in my brief at the end. It's almost identical to the case in this situation. Two adjacent owners were going to develop their property together. Ten years passed because of a lot of things, including the change in zoning. One of the owners sold his portion of the property, but before that owner did, there was a covenant saying that they had to pay for all of these improvements. The court determined in the language that the court used and is quoted in my brief is square on with the concept of this case. I ask you just to take a look at it. Thank you very much. Mr. Kansky. May it please the court. I'd like to start by just framing a little bit the context of the case. There was a bench trial in this case back in, I believe, 2011. As a result of that, there was a judgment order entered by the trial court, which indicated that based upon the language of the deed itself, which the trial court felt was clear and unambiguous and that it did not create a covenant running with the land, indicating that the college would be obligated to build a road for a successor entitled to the original owner. That was the primary reason why the trial court decided the case the way it did, although the court did review all the evidence and testimony and other exhibits and stipulated facts in the case. The Court of Appeals, in its Rule 23 order, basically said that it disagreed and that the language could be read to either create a covenant running with the land or not create a covenant running with the land. We mandated the case back to the trial court to allow any other evidence that there was available and also to determine from the evidence in the record what the intent of the parties were. The trial court on the remand, I think, scrupulously reviewed all of the record, reviewed all of the stipulations, the facts, the many exhibits, all the documents, and determined that there was not a covenant running with the land insofar as the college's obligation to build the road was concerned. There is a covenant running with the land that is contained in the language of the deed, which has always been conceded by Illinois Central College, that there was an obligation on the part of Illinois Central College to not change the access point, which is at Station 315, which is on the extreme northwest corner of the 25-acre parcel that was purchased, and also that there would be an easement, an easement for access and ingress to the remaining home property south of 24 to the west of that 25 acres that was purchased. And there's a joint exhibit 22 in the record that clearly shows where this parcel is, where Station 315, which is the access, is, and so on. So the trial court did that, scrupulously reviewed the entire record, and in this case including all the exhibits and, as I say, the various stipulated facts and the testimony of the witnesses, and concluded that, in fact, taken, if you look at all the different transaction documents involved, if you look at the option and the agreement dated May 12, 1967, which was the specific agreement that dealt with the construction of the road, take all that together with the underlying circumstances at the time the property was purchased by ICC, and also even to a lesser extent, but also what happened subsequent to this. How did the parties treat this obligation of the college to build the road? And the court found in its April 23, 2013 order that if you consider all of that, a rational and sound interpretation of all of this leads to the conclusion that Cone and ICC did not intend to create a covenant running with the land so as to require ICC to construct an access road beyond its contractual obligation to Cone, which is contained in the May 12, 1967 agreement, which is the document that specifically talks about the time frame for this road construction and so on. So that's kind of the overall background of it. I think the judge's decision, again, very scrupulously followed the instructions of the Court of Appeals in the remand order, and I believe should not be reversed or overturned based upon the manifest weight of the evidence in this case, because that's the standard I think that should be used by the Court of Appeals. Now let me kind of hone in on, first of all, the factual circumstances at the time of purchase. This is 1966 when it starts, and the factual circumstances are that the college has recently been voted into existence by the voters of the various counties that were then part of this, and it was called a junior college back then after a few years, the statute was changed to make it a community college, and so the first task obviously was to buy some property that they would use to build the college. So they acquired 440 acres of property south of Route 24, which is their East Peoria campus. They purchased 400 of those acres at the average price of about $1,770 per acre, and they had 40 acres gifted to them for the total of 440. The 25 acres that we're talking about here would be the extreme northwest corner of the property that they purchased. None of the buildings of the campus are on the property. None of the roads of the college are on this property. It is just 25 acres, and it was not critical to any of the buildings, nor any of the roads as you can see from the joint exhibit 22, which is in the record. The first agreement is the option agreement. Back when the college was acquiring these acres, it entered into an option agreement with Combs, and this is back in November of 1966, and basically the option says that it is understood that the purchaser contemplates that said premises shall be used as part of the site for the construction of the school buildings of the college. It is the expressed promise and covenant of the purchaser upon the exercise of this option that the point of access shall not be changed from its present location except upon the written consent of the undersigned. In other words, as Mr. Porry said, they were required by IDOT their only access onto Route 24 would be at Station 315. And then they said that the undersigned reserved an easement from the point of access over such route as the undersigned may determine. Now the term undersigned in the document refers to Combs. Said easement shall be over said route as the undersigned shall determine to be required for their use and for the benefit of the successors in title of the undersigned as well. The point is that the point of access would not be moved without the written consent, and the easement would be for the benefit of the successors in title. The next paragraph, which is paragraph 10 of the option, says as an additional consideration and as further payment for the premises which are the subject of this option, purchaser agrees within one year of delivery after, within one year of delivery of the deed to build and construct the access road from the point of access to that part of the undersigned retained by them. Okay, that's the key thing that there's going to be within one year of delivery. As additional consideration, the college agreed to build an access road. Okay, now that's logical and it's rational because the college is acquiring this property, Cone knew that, and for a community college, and it's going to have to build its own access road. It is, IDOT will not permit it to use, will not permit the college to use Station 315 for its access road. There was no intention to use Station 315. The college's access road is further to the east on Route 24 at what is known as Station 333 plus 50, I believe. So it's further to the east. That's where IDOT said you can have your access road. And it makes sense that Cone, in selling the property to ICC, rather than him having to put in an access road at his property, would say to the college, you're going to have to do that anyway. You're going to have to build your entrance road. Would you agree to build that as additional consideration for the purchase? His entrance road to his landlocked property. His access road to his property, yes, off of Route 24. Which would be landlocked otherwise. Which would be landlocked otherwise in terms of access to Route 24, yes. And so that happens. Basically then, in April and May of 1967, the college exercises its option, and in May of 1967, they then enter into an agreement that is not in the deed. It's the separate agreement that's referred to in the option. And the separate agreement, which is joint Exhibit 4, the deed itself is joint Exhibit 3. The separate agreement says sellers, meaning the Cone family, shall designate in writing not less than three months from date, which is May 12, 1967, the route of the easement reserved by sellers in said conveyance attached here to as Exhibit A, which was the deed. Purchasers shall within one year after date dedicate the route designated by sellers for use as a public street and highway, and purchaser shall further at their expense improve said land and build said public street. According to the specific document that talks about the promise of the college to build the road and the time frame in which it was going to occur in, all of this was supposed to have occurred within one year from the conveyance of the property itself. In other words, one year after the deed. And this is the point that I think the trial court is looking at here when the trial court's reviewing the documents. Basically, this is a separate agreement. It's not part of the deed itself, and it is the separate agreement referred to in the option agreement, which sets a one-year time frame for this. And in fact, within that one-year period, the college was prepared to build the road for them. They had an architect, an engineering firm design it, and they were going to build it as a part of building their own entrance road. And that building process of their own entrance road commenced in September of 67. However, it didn't get done in September of 67, because Mr. Cohn did not give the college, did not designate in writing within that three-month period the route of the easement reserved by sellers in said conveyance, reserved by the sellers. He didn't designate the route. And he didn't wind up designating the route until actually 1977. And when he designated the route, then the college and Mr. Cohn got together, and the college took his designation of the route, which is four-tenths of an acre. So the route that he designated is four-tenths of an acre. A very small parcel at the very northwest corner of the 25 acres to the south of Route 24 that the college acquired, that abuts 24. Okay, thank you. Why is that important? It is important because all of the road construction that is involved in this case, 99% of the road construction, did not occur on this .4 acres. 99% of the road construction which happened, that Villanova Development did beginning in 2005 and 2006, involves supporting a very large residential subdivision. And they had to build a deceleration lane coming up the hill off of 116, up the hill they had to build a large deceleration lane, they had to build an acceleration lane, and they had to build a left turn into the property if you're going west on 24 out in the middle of 24. And that's what they had to build to support a large residential subdivision. Back in 1966 and 1967, when the college was acquiring this property, all this property was zoned agricultural. There's nothing in the record to support any argument that Cone and the college intended that there be a large multi-hundred thousand dollar road construction project to access the remaining Cone property. But wasn't Cone entitled to go from his north side property he retained when the road went through his property and split it? That he could go from the north to the south side of his property? From the north side on the north side of 24? No, he was, well no, because he was permitted under the IDOT order to have a, it was the same station, but yeah, he wasn't allowed to go across 24. Yeah, but no, well I mean no, he had a turn, he was allowed to access 24 at station 315. Correct, to go to the south property or the north property? No, just to access 24. It doesn't say anything about to access the south property. It was not intended by the IDOT order that there be some kind of bridge or any kind of crossover between his north property and the south property. Okay, that was my question. So station 315 the allowed access onto 24 would only benefit his south property? Right, and in 1960 excuse me, in 1978 then after the college received finally the .4 acre designation, they went ahead and dedicated that as a public road, and then they worked out with Cone the amount of money that the college was going to build the road. Which was a fulfillment of the college's original consideration. Exactly, the college promised him as additional consideration for the purchase that they would build the road. So here's how they calculated it. They took the original amount that was in the bid of the contractor that was contracted with by the college to build the entrance road. As a small part of that contract he was going to build the Cone access road. That figure was like $6,700. And then they factored in the interest over the approximate 10 year period. The interesting thing about it is the interest rate then was 6%, and there's an exhibit in the file basically that the ICC person who calculated it said to ICC's lawyer, please give our regrets to Cone's attorney that the interest rate is so low. 6% a year over all that period of time. Because that was in the days when people were getting 8, 9, 10%. But because the college must only invest in government backed securities, it was she was kind of kidding that this was a small amount. That's how they came up with the $12,000 release price. So your Honor, in closing I would just respectfully ask the court to approve the 23rd 2013 order of the trial. Thanks Mr. Kansky. Mr. Corey some rebuttal. Exhibit 4 is the May 12, 1967 agreement. I want to read the last preamble paragraph. Whereas the parties desire to give effect to all of the terms of said option to purchase with respect to purchaser's performance under the provisions of paragraphs 9 and 10 of said option to purchase. And it goes on to cite what that is in paragraph 2 of that agreement saying that they have to dedicate and construct. The other point I would like to make, Your Honor, is the time frame between when that should have happened and when it did happen was a lot of years. But they were supposed to construct, ICC was supposed to construct an entranceway that was compatible with the requirements of IDOT and the City of East Peoria. That's what the option agreement says. That's what plaintiffs had to do. So the cost of that construction was borne by the plaintiffs. They did not add any extra not one penny extra requirement that IDOT did not require. That's why the cost was what they were. That would be the obligation of the ICC in this particular case. And finally I mean, just not that I suppose it matters legally, but practically if they had built a road that would have qualified back in the 1960s would you think they'd be able to use that road for this new development today? Would you think it would satisfy your needs? You know, I can't answer that. I suspect they'd probably have to make some improvements. If I were totally honest with the court and I were an IDOT person, I don't know what type of road they would have built because I don't know what type of road IDOT would have required them to build at that time. And IDOT may have required a deacceleration lane because this was a U.S. Route 24 they were going off of and that's what they required of us at this point. So I don't know how much other improvements they might have required, but they certainly would have required a lot more, I mean a lot less than what they did now. Thank you so much. If it's not understood, I would ask that the verdict be reversed. Thank you, and thank you both for your arguments here this morning. The matter will be taken under advisement, a written disposition will be issued, and the court will now be in recess until 1.15.